ALF BENNETT LUMBER COMPANY *v.* WALNUT LAKE CYPRESS COMPANY.

Opinion delivered November 11, 1912.

1. CONTRACTS—INTERPRETATION.—The purpose of the interpretation of contracts is to ascertain the intent of the parties as shown by the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into consideration, the words used would commonly be understood.    (Page 428.)

2. AGENCY—TERMINATION OF AGENCY.—A contract between a manufacturer of cypress lumber and a selling company, making the latter the former's exclusive sales agent and providing that it should remain in force as long as the former was operating its plant and until the lumber it then owned and should in the future purchase should have been cut into lumber, did not authorize the former to terminate it by ceasing to operate its mill, but required that it should not be terminated until the lumber owned by the former, tributary to its mill, should have been cut into lumber.    (Page 429.)

3. CONTRACT—BREACH—WAIVER.—Where a party to a contract, with knowledge of breaches by the other party, solicits and receives an additional loan under the contract, it will be held to have waived the breaches of the contract.    (Page 430.)

4. DAMAGES—BREACH OF CONTRACT—PROSPECTIVE PROFITS.—Where a party to a contract is prevented from performing same by fault of the other party, he is entitled to recover the profits which the evidence makes it reasonably certain he would have made had the other party carried out his contract.    (Page 432.)

5. SAME—BURDEN OF PROOF.—One suing to recover profits lost through defendant's breach of a contract has the burden of proving the amount of its damages therefrom.    (Page 433.)

6.   Corporations—dissolution—debts.—Under Kirby's Digest, § 958, providing that when a corporation surrenders its charter, the chancery court shall have jurisdiction to pay its debts and distribute its assets, a liability of such a corporation arising from its wrongful cancellation of a contract is a debt for which its assets are liable.   (Page 434.)

Appeal from Jefferson Chancery Court; *John M. Elliott*, Chancellor; reversed.

### STATEMENT BY THE COURT.

Appellee Walnut Lake Cypress Company was a corporation organized under the laws of the State of Arkansas on February 16, 1907. Its stockholders were E. P. Ladd, C. S. Bacon, W. B. Craft and R. E. Schulze. Mr. Ladd was president, and Mr. Craft was secretary and treasurer, and was in the active management of the business. It does not appear that the other two stockholders took any active part in the business. The corporation was organized for the purpose of owning and operating a saw mill for the manufacture of cypress lumber. The company owned about twenty-five million feet of cypress lumber situated near Walnut Lake, Arkansas, and the mill was built and operated at that point. The saw mill had not been built at the time of the incorporation of the company, and it did not commence to operate until May, 1908. In the fall of 1907 the company, being pressed for money to finish the erection of the mill, opened negotiations for a loan with the appellant, Alf Bennett Lumber Company, located at St. Louis, Missouri. The latter company was engaged in the business of selling the output of various lumber mills. Alf Bennett was the president of the company, and Mr. Ladd, president of the Walnut Lake Compny, had known him for several years. Ladd gave Craft a letter of introduction to Bennett. Craft then went to St. Louis, and asked Bennett for a loan of a sum of money, which it was afterwards agreed to be fifteen thousand dollars. The indebtedness was to be evidenced by short time notes, which were to be extended from time to time until the Walnut Lake Company began to sell its output. As an inducement to the Alf Bennett Company to make this loan, Craft proposed that the two companies should enter into a contract by which the Bennett Company should have the entire charge of selling the output of the Wal-

nut Lake Company. Such a contract was finally agreed upon. It was dated October 16, 1907, and is as follows:

"This agreement, made and entered into on the 16th day of October, 1907, between the Walnut Lake Cypress Company, a corporation organized and doing business under the laws of the State of Arkansas, party of the first part, and the Alf Bennett Lumber Company, a corporation organized and doing business under the laws of the State of Missouri, party of the second part. Witnesseth:

"Whereas, the party of the first part is operating a saw mill for the manufacture of cypress, oak and gum lumber and lath at Walnut Lake, Arkansas; and,

"Whereas, it is deemed mutually advantageous for the party of the second part to be the exclusive sales agent for the party of the first part for its entire cypress, oak and gum manufactured products aforesaid, for the period of time hereinafter set out in this contract, and upon the terms and conditions set out;

"Now, therefore, to that end it is agreed between the parties hereto as follows:

"1. The party of the first part agrees that, during the life of this contract, the party of the second part shall be its exclusive sales agent for the sale and marketing of the entire cypress, oak and gum manufactured products of its saw mill and plant as aforesaid.

"2. As such sales agent, the party of the second part shall fix the selling price of said manufactured products, subject to the approval of the party of the first part, and shall pay the party of the first part the same price that they obtain for such products.

"3. In the event that the party of the first part receives orders for any of its cypress, gum and oak lumber products direct from proposed purchasers or through any sources other than the party of the second part, such orders shall be filled upon the direction and order of the party of the second part.

"4. All shipments shall be made and billed and invoiced to the persons and as directed by the parties of the second part.

"5. The party of the second part agrees to guarantee the payment of the net amount (after deducting commissions

of the party of the second part) upon all shipments sold and delivered through orders secured by the party of the second part within fifteen (15) days from the date of invoice or invoices for such shipments.

"6.    In the event that, upon shipments paid for to the party of the second part, the purchaser shall make deductions on account of the grade of the lumber shipped, or because of damage in transit, the party of the second part shall be credited by the party of the first part with the amount of such deductions, and adjustments shall be made between the party making such deductions and the party of the first part.

"7.    The party of the second part for its services shall be entitled to, and may retain, out of any settlement made with the party of the first part, a commission of 5 per cent. upon the net amount of invoices for all shipments, after deducting freight, in addition to the regular 2 per cent. discount for cash.

"8.    In view of the fact that settlements between the parties hereto on account of shipments will often be made on estimated freight charges, it is agreed that monthly corrections and adjustments of the accounts of the parties hereto shall be made on or before the 10th day of each calendar month throughout the year.

"9.    This contract shall be and remain in force and effect as long as the party of the first part is operating their plant at that point, and until all the timber they now own and shall in the future purchase shall have been cut into lumber.

"10.    It is further agreed that the party of the first part shall have the right to inspect all orders on the books of the party of the second part whenever they may desire, and the party of the second part obligates itself at all times to secure the highest market price which it is their ability to obtain.

"11.    It is understood that any local sales of lumber by the party of the first part in less than carload lots shall be exempt from the commission of the party of the second part."

After the contract had been entered into, the Bennett Company proceeded to lend the Walnut Lake Company the sum of fifteen thousand dollars, as had been verbally agreed upon. The loan was made during the winter of 1907 and 1908. As the notes became due, they were renewed from time to time,

and the accruing interest was by agreement between the parties entered on the books of the Bennett Company as an open account charged against the Walnut Lake Company. The Walnut Lake Company commenced cutting lumber in May, 1908, and the Bennett Company, as its agent, began to sell the output under the terms of the contract. The testimony shows that it requires from three to four months for lumber to become sufficiently dry to ship, and that none of the stock of the Walnut Lake Company was in condition to ship until about the middle of July. On October 26, 1908, Mr. Craft wrote to the Bennett Company and cancelled the contract between the two companies. The letter stated that the Bennett Company had failed to make sales according to the contract and to advise truthfully in regard thereto, and that for these and many other violations of the contract the Walnut Lake Company cancelled the contract and refused to permit the Bennett Company to make any further sales of lumber for it.

On October 28, 1908, a meeting of the stockholders of the Walnut Lake Company was held, and a resolution to dissolve the corporation was adopted. On October 30, 1908, a petition was filed in the chancery court praying for the appointment of a receiver to take charge of the assets of the company. This was done in pursuance of section 958, Kirby's Digest, which provides that when any corporation has surrendered its charter the chancery court shall have jurisdiction to pay its debts and to distribute its assets among the stockholders according to their several interests.

A receiver was duly appointed, and subsequently filed a report showing assets amounting to $229,388.55 and liabilities in the sum of $87,866.67. On December 5, 1908, the Alf Bennett Company filed an intervention in the nature of a claim for damages in the sum of $32,000, which it alleged it would have earned under the contract had it been permitted to have carried it out. In its intervention it alleged that it had complied with its part of the contract, and that the notification of the abrogation of the contract, the surrender of the charter and the appointment of a receiver were in pursuance of a conspiracy entered into by the stockholders of the Walnut Lake Company for the purpose of evading the obligations of the contract between that company and the Bennett Company.

On January 20, 1909, the court ordered the receiver to sell the assets of the Walnut Lake Company at public sale. This was done on February 28, following, and the entire property was bought in by Mr. Craft for $115,000. Craft gave bond to secure the deferred payments, with Mr. Bacon and Mr. Ladd as his sureties. Mr. Craft in purchasing the assets of the receiver acted for himself, for Mr. Ladd, Mr. Shultze and Mr. Guthrie. Mr. Bacon had already sold his interest to Mr. Ladd. Immediately after the sale the mill and all the assets were turned over to the new company, which had been organized with the same stockholders, except Mr. Bacon, who had sold his interest to Mr. Ladd, and Mr. Guthrie who had subscribed for five thousand dollars stock in the new company. The new company, called "The E. P. Ladd Cypress Company," took up the indebtedness of the Walnut Lake Company, and proceeded to operate the saw mill. It operated it for the next three years, and during the time cut about eighteen million feet of lumber.

The testimony in the case is very voluminous, and, that the opinion may not be too long, the remaining facts in the case will be stated and referred to under appropriate headings in the opinion.

The chancellor found in favor of appellee, Walnut Lake Cypress Company, and the case is here on appeal.

*A. H. Rowell* and *Charles A. Houts,* for appellant.

1.   The contract was not induced by any misrepresentations on the part of Bennett, and the claim that he violated the contract is without merit, there being no substantial violation.

2.   If there were any violations by appellant of the contract, or any misrepresentations in inducing the contract, they were waived by the Walnut Lake Company when Ladd, after charging Bennett with all the violations which appellees now claim authorized the cancellation, and with full knowledge of all the facts, offered Bennett one thousand dollars to cancel the contract, and, on being refused, asked for and obtained a loan to the Walnut Lake Company of five thousand dollars additional, and thereafter they proceeded under the contract to sell lumber just as before.   88 Ark. 491.

3. The contract was not terminable under its terms until all the timber owned by the Walnut Lake Cypress Company was cut into lumber. See paragraph 9 of the contract. 69 Fed. 773; 108 Ill. 656; 40 Minn. 497; 1 Wash. 579; 116 Wis. 549; 61 Mo. 534.

4. The assets in the hands of the receiver of the Walnut Lake Cypress Company are liable for any damages accrued to appellant by reason of the abrogation of the contract. 60 Minn. 284; 74 Minn. 98; 40 Atl. (N. J.) 591; 54 O. St. 157.

5. The damages claimed by appellant are the proximate and certain result of the breach of contract. 78 Ark. 336.

*Bradshaw, Rhoton & Helm* and *Danaher & Danaher,* for appellees.

1. The court was right in finding that the contract was obtained by misrepresentations. Bennett's statements that he possessed good ability in selling cypress lumber, had better facilities for making sales than appellee cypress company, and could handle its output to better advantage, induced the latter to enter into the agreement. It was not, as appellant claims, a mere expression of opinion, but was a statement of a material inducing fact.

2. There was no waiver. In order to constitute a waiver, there must exist either an agreement to waive, based on a valuable consideration, or an implied waiver based on the conduct of the party amounting to an estoppel. 130 Cal. 245, 253; 116 N. W. 132, 136; 140 Mass. 261, 264; 35 Minn. 451; 98 Mo. App. 53; 57 N. Y. 500; 1 Am. Rep. 548; 30 N. Y. 136; 86 Am. Dec. 362; 132 N. Y. App. Div. 250; 24 *Id.* 547; 63 O. St. 183; 79 Pa. St. 46; 95 Tenn. 38; 41 Am. Rep. 647; 31 Tex. 633; 40 Vt. 316. Conduct forced upon a party by circumstances can not be held to be voluntary, and waiver can not be predicated thereon. 12 Ill. App. 463; 19 Wis. 26; 69 N. C. 7; 34 La. Ann. 209; 17 N. Y. 173, 72 Am. Dec. 442; 33 O. St. 336.

3. Appellant's contention as to the duration of the contract is untenable. There is nothing in paragraph 9 to indicate an intention to bind the appellee cypress company to operate the plant for any definite time, or to cut all the timber then owned into lumber. The manifest intent of the parties was

that the contract should be in force only so long as both of the conditions named continued to exist, viz., while the Walnut Lake Cypress Company operated its plant at that point, and its lumber remained uncut. 1 App. Cas. 256, 47 L. J. Exch. 396; L. R. 5 Ch. 737, 39 L. J. Ch. 685, 23 L. T. Rep. 685, 18 Wkly. Rep. 1122; 21 T. L. R. 82; 14 Can. L. T. O. C. C. notes 394, 25 Ont. 291.

4. That a corporation can not escape from its liabilities by dissolving is conceded; but the dissolution of the company in this case worked a termination of the contract because the parties contracted that the dissolution of the corporation should terminate their dealings.

5. There is no evidence in the record from which a proper estimate of the damages to which appellant was entitled, if any, can be made.

HART, J., (after stating the facts). The right of appellant to recover in this case depends upon the construction of the ninth clause of the contract, which is as follows: "This contract shall be and remain in force and effect as long as the party of the first part is operating their plant at that point, and until all the timber they now own and shall in future purchase shall have been cut into lumber."

The purpose of all interpretation is to ascertain and give effect to the intention of the parties to the contract as expressed by their writing, and in doing this it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties and the sense in which, taking these things into consideration, the words used would be commonly understood; for it fairly may be assumed that the parties used and understood them in that sense. Applying this fundamental rule of construction, it is contended by counsel for appellee that the Walnut Lake Company in making this contract foresaw that it might wish to sell or be forced to quit business at any time, and therefore embodied in the contract the provision that the contract should remain in force only so long as it was "operating their plant at that point." They insist that the further words, "and until all the timber they now own and shall in the future purchase shall have been cut into lumber," were added to cover the possible contingency that the Walnut Lake Company, in

case of fire or other casualties to its plant, might wish to rebuild at some other point and cut the timber at a new mill site. They contend that the evident intention of the parties, as expressed by the language of the contract, was that the contract should be in force only so long as both of the conditions may continue to exist, viz: While the Walnut Lake Company operates its plant at Walnut Lake, and its timber remained uncut. We can not agree with their contention. The Bennett Company was not engaged in the business of loaning money, but was engaged in the business of selling lumber for those who manufactured it. The lending of money to its customers was merely an incident to its principal business. It was principally engaged in the business of selling pine lumber at the time the contract was entered into, and, in order to carry out the contract with the Walnut Lake Company, it was necessary to make some changes in the conduct of its business in order to enable it to successfully sell cypress lumber. Under these circumstances, it is unreasonable to suppose that the parties to the contract contemplated an agreement which could be terminated by the Walnut Lake Company ceasing to operate its mill at Walnut Lake before its timber was sawed into lumber. Such a construction would not give any meaning to the clause, "and until all the timber they now own and in the future shall purchase shall have been cut into lumber."

We are of the opinion that the contract as made clearly indicates that it was not intended that the contract should be terminated until the timber owned by the Walnut Lake Company, tributary to the site of the mill at Walnut Lake, should have been cut into lumber. As illustrative cases sustaining our contention, we cite the following: *Mississippi River Logging Co.* v. *Robson,* 69 Fed. 773; *Lewis* v. *Atlas Mutual Life Insurance Co.,* 61 Mo. 534; *Ford Hardwood Lumber Co.* v. *Clement,* 97 Ark. 522.

2. The next question we shall consider is whether or not the Walnut Lake Company was induced to make the contract by the fraudulent representations of the Bennett Company. To sustain the finding of the chancellor in behalf of the appellee, it is claimed that Bennett misrepresented his ability to sell cypress lumber. Concerning this matter, Ladd testified that

some time before the contract was entered into he met Mr. Bennett on the train, and they got into a conversation in regard to making a contract to give Bennett the exclusive sale of the output of the saw mill when it was erected and put in operation. Nothing definite was arranged about the contract at that time. Bennett explained to Ladd that his company had a large selling force, and that they understood the handling of cypress lumber to good purpose; that they could handle it to better advantage than the manufacturers of the lumber. Craft conducted the negotiations leading up to the making of the contract. In regard to this he testified as follows: "We were desirous of a line of credit, and I went to see Mr. Bennett, and he represented that he had special ability to sell our stock, for the reason that he had a large selling force, and had experience in selling cypress, and represented that he would be able to help us out to the extent that we would probably need money until such time as we could make other arrangements. We insisted on his going into the matter thoroughly, and he explained that he had had some four or five years' experience in selling cypress, and that, while he did not have any one in his office that had had more experience than he had, he would give the matter his personal attention. He related the experience he had had, and stated why he wished to make this contract with us; said that he had found our stock, that is, the stock that the old concern had turned out, to be a very superior grade; that he had found us hard competitors to get over, and for these reasons he specially desired the selling contract. In view of these representations and believing that he had the ability, we considered making the contract with Mr. Bennett, and Mr. Bennett and I went into the terms of the contract together. I made the contract with him under the representations made by him."

In addition it is shown that, after the Bennett Company began to sell the lumber for the Walnut Lake Company, Ladd and Craft at different times each went to St. Louis and assisted Bennett in making sales of some lumber. At none of these times, however, did they go to St. Louis for that purpose. They went there for the purpose of borrowing money with which to run the mill, and while there went with Bennett to some old customers of Ladd who had bought lumber from him

while he was engaged in the saw mill business prior to the time the Walnut Lake Compnay was organized. There is nothing in the testimony to indicate that Bennett's corporation was not competent to handle, as sales agent, the putput of the Walnut Lake Company's saw mill. The testimony shows that Alf Bennett, the president of the company, had had several years' experience in the sale of cypress lumber, and that he employed another person to take charge of a department of the company for the sale of cypress lumber, and that the man so employed had had several years' experience in selling cypress lumber. If it can be said that the representations made by Bennett amounted to anything more than a mere expression of opinion as to his company's ability to act as sales agent for the Walnut Lake Company in the sale of the output of its mill, certainly it can not be said that the testimony is sufficient to sustain the charge of false representations as to the ability of the Bennett Company to act as sales agent under the contract.

3. It is also claimed that the decision of the chancellor should be upheld because the appellant committed certain breaches of the contract. One of these is that it failed to make certain remittances of the proceeds of the sales within the time specified in the contract. Another is that a customer who had purchased lumber put in a claim for damages due to the fact that the lumber shipped to it did not correspond with the grade mentioned in the order. The Bennett Company allowed this customer a reduction, but the deduction was not not large enough according to the contention of the Walnut Lake Company. It claimed that the Bennett Company damaged its reputation for fair dealing by not allowing the claim in full. Another alleged breach of the contract is that the Bennett Company did not sell the lumber in all instances according to the grades' of the Walnut Lake Company. The testimony shows that the Walnut Lake Company graded its lumber according to its own rules, and that its grading did not correspond with the grading rules of the Southern Cypress Manufacturers' Association, which were considered standard throughout the territory in which the Walnut Lake Company's stock was sold. To illustrate, the Walnut Lake Company's number three common was equivalent to the association's

grade of number two common. In other words, the Walnut Lake Company graded its lumber one grade higher than the association's corresponding grades. Old customers of Ladd understood this difference in the grading and purchased accordingly. New customers did not understand the difference in the grading, and on that account it was difficult to sell them. So in some cases the Bennett Company, in order to make sales to new companies, billed the lumber to them according to the grades of the association, but remitted the full amount of the proceeds, less its commission, to the Walnut Lake Company. Still another alleged breach of the contract is, that at one time the Bennett Company employed a sub-agent to sell some lumber and endeavored to charge up the Walnut Lake Company with his commission in addition to its own, but the testimony shows that when the Bennett Company's attention was called to the matter it rectified the mistake. In regard to these alleged breaches of the contract but little need be said, for the reason that, if it be conceded they were breaches of the contract, the Walnut Lake Company waived them. The testimony shows that in the latter part of September, 1908, Mr. Ladd made a trip to St. Louis for the purpose of inducing Mr. Bennett to cancel the contract. At that time Mr. Ladd was in possession of all of the facts and circumstances connected with these alleged breaches of the contract. He told Mr. Bennett that he had not been living up to his contract, and that he wanted him to cancel it. He told Bennett that they needed more money. Bennett refused to cancel the contract but offered to secure for the Walnut Lake Company five thousand dollars, in addition to the fifteen thousand already loaned it. Ladd told Bennett that they had to have the money, and that, if he would not release them from the contract, they would take that. Bennett afterwards did arrange it and raised the five thousand dollars for the Walnut Lake Company, as he had agreed to do.

Thus it will be seen that Ladd acted with the full knowledge of all the facts and circumstances connected with the alleged breaches of the contract, and will be deemed to have waived them. *Grayson-McLeod Lumber Co.* v. *Slack*, 102 Ark. 79; *Thomas-Huycke-Martin Co.* v. *Gray*, 94 Ark. 9.

4. Can the appellant recover its prospective profits as

damages? In the case of *Ford Hardwood Lumber Co.* v. *Clement,* 97 Ark. 523, it is held: "Where plaintiff agreed to perform certain work for defendant which he was prevented from doing by defendant's fault, he is entitled to recover the profits which the evidence makes it reasonably certain that he would have made, had defendant carried out its contract." See also *Singer Mfg. Co.* v. *W. D. Reeves Lumber Co.,* 95 Ark. 363; *Spencer Med. Co.* v. *Hall,* 78 Ark. 336.

The burden was on the appellant to prove the amount of its alleged damages. *Gay Oil Co.* v. *Muskogee Refining Co.,* 97 Ark. 502. In the present state of proof, as abstracted, the testimony for the appellant does not aid us in arriving at a correct conclusion as to the amount of damages suffered by appellant. It is true that Alf Bennett, the president of the company, testified as to the gross amount of profits his company would have earned, but, according to the terms of the contract, this would not be the compensation due it. In arriving at the prospective profits we must look principally to the testimony of Mr. Craft, who was the secretary of the Walnut Lake Company, and who was introduced as a witness by it. Section 7 of the contract is the one which provides for the amount of commissions to be paid. Craft testified that, considering the invoices, appellant would not have made more than a gross profit of eighty cents per thousand feet. He also testified that it would cost appellant fifty cents per thousand feet to sell the lumber. This would leave it a net profit of thirty cents per thousand feet. Under clause 11 of the contract, local sales of lumber in less than carload lots were exempt from the commission. Lumber used by the Walnut Lake Company in the erection of its building was also exempt. Then, too, it will be remembered that appellant had been paid for the lumber sold by it up to the time that the Walnut Lake Company refused to permit it to continue to act as sales agent. Again, Craft says that in sawing up lumber a certain amount of stock is always accumulated, which can not be shipped at a profit. When all of these matters are considered, he estimates that no more than thirteen million feet of lumber could have been shipped by the Walnut Lake Company after the time it cancelled the contract. The net profits that would have accumulated to appellant from

the sale of this lumber would be thirty cents per thousand feet on thirteen million feet, which amounts to $3,900, and this is the amount appellant is entitled to recover as damages ·in this case.

5.    Section 958, Kirby's Digest, provides that when any corporation has surrendered its charter the chancery court shall have jurisdiction to pay its debts and to distribute its assets among the stockholders according to their several interests. Pursuant to this section of the Digest, a receiver was appointed for the Walnut Lake Company when it surrendered its charter. During the pendency of the proceedings to wind up its affairs appellant filed its intervention claiming damages for the breach of the contract with it.

Inasmuch as we have held that the Walnut Lake Company had no right to cancel the contract and that appellant was entitled to recover damages under it, it follows that the claim of appellant for damages was a debt of the corporation, and the assets of the corporation in the hands of the receiver are liable for the amount of this claim.

The decree of the chancellor will therefore be reversed, and judgment entered here for appellant in the sum of $3,900.