MAGNESS v. MADDEN.

4-8381                                        207 S. W. 2d 714

Opinion delivered January 12, 1948.

Rehearing denied February 16, 1948.

*Wils Davis* and *Cecil Nance*, for appellant.

*Hale & Fogleman*, for appellee.

HOLT, J. Appellee, R. V. Madden, brought this suit against appellant, B. P. Magness, to recover damages for an alleged breach of a contract of employment.

From a judgment, on a jury's verdict, awarding appellee $5,250, comes this appeal.

Appellee, in substance, alleged in his complaint that about June 2, 1945, appellant employed him as manager of the Earle Fertilizer & Seed Company and the Magness Milling Company, for a term of five years at a salary of $350 per month, plus 30% of the net profits of the business, "guaranteeing the plaintiff (appellee) that such profits would not be less than $50 per month, and further agreeing to pay all travelling, entertaining and other expenses incident to the operation of the business; that said contract was in writing" and signed by the parties; that appellee entered upon his duties prior to July 1, 1945, and continued until November 3, 1945, when he was discharged, without reasonable cause, by appellant and sought damages in the amount of $8,000.

Appellant's answer was a general denial and affirmatively pleaded the Statute of Frauds as a complete defense and further defended on the ground that at the time of the execution of the alleged contract, he was so intoxicated that he did not grasp or comprehend the consequences of his acts.

Appellee based his right to recover upon the following writing, in the form of a letter: "June 1, 1945. Mr. R. V. Madden, Osceola, Ark. Dear Sir: Confirming our conversation today we offered you the position as Manager of the Earle Fertilizer & Seed Company and the Magness Milling Company on the following terms.

"We agree to pay you a salary of $350 per month plus 30% of the net profits from these businesses. Guaranteeing that this will equal a salary of $400 per month. All traveling and entertainment and any other expenses pertaining to the operation of the business will be paid by the Company. The office overhead expenses to be equitably prorated at a later date. We will make satisfactory financial arrangements to handle the maximum amount of business. You are also given an option to

buy 1/3 of the business on or before five years at the original cost plus improvements less normal depreciation.

"I own the Magness Milling Company and 75% of the Earle Fertilizer & Seed Company. Yours very truly, (signed) B. P. Magness, B. P. Magness. Accepted 6/2/45 (signed) R. V. Madden—Signed 7/20/45."

The trial court took the view that there was sufficient ambiguity in the contract to warrant its construction to be submitted to the jury and this was done under appropriate instructions.

Appellant argues that the court erred in so doing and says "there is no ambiguity in the contract. Its construction was for the court, not the jury." "But the trial court should not have submitted to the jury the question of construction of this contract and left to it the right to fix its terms, for the reason that there was no ambiguity."

It was appellant's contention that under the plain terms of the contract appellee's employment was from month to month, whereas appellee contended that his employment was intended to be for a term of five years as provided in the following clause: "You are also given an option to buy 1/3 of the business on or before five years at the original cost plus improvements less normal depreciation," and that we think when the contract is considered in its entirety, as it must be, that there was sufficient uncertainty as to what the parties intended by the words used, as to the duration of the employment, to make a jury question, and extrinsic testimony was properly admissible to show the intention of the parties.

In the early case of *Haney* v. *Caldwell*, 35 Ark. 156, Mr. Justice Battle, speaking for the court, said: "As a general rule, oral evidence is not admissible to contradict or vary the terms of a valid written contract. . . . But if a contract is not certainly intelligible by itself, extrinsic testimony is admissible to show the intention of the parties, . . . In all such cases the extrinsic testimony is not admitted to prove what the parties to the instrument may have secretly intended; or to add

to, take from, change, vary, contradict, or modify; but to find out what is the meaning of the written words they have used, and the true sense thereof as they used them.''

Appellee testified that he was 53 years of age and had been an oil worker from about the age of 18, and had held various positions until July, 1936, when he became manager of the Ralston-Purina Mill at Osceola, which he held until June 5, 1945, as long as the company owned the plant. There was evidence that he was capable and a highly efficient operating manager. He was a successful and skilled mill superintendent with valuable connections, knew the industry well and was successful in building up the Ralston-Purina's business.

Appellant, Magness, a farmer and ginner, being in need of a manager, sought out appellee and as a result, the contract, *supra,* was entered into between them. Appellee began actual work under the terms of the contract on July 1, 1945, and on the first Saturday of November, 1945, after the mill was in operating condition, appellant discharged appellee on the ground that appellee was ''too high priced a man,'' and because only one man could run the business on the black market.

At the time of his discharge, appellee was paid four months' salary in the amount of $1,400.

Appellee testified: ''I told Mr. Magness that I wouldn't consider coming down there for one year; and unless it was a permanent thing, I wouldn't consider it. He said 'come on down, it's permanent,' '' although he, appellee, understood the contract to cover a period of five years. He further testified that appellant suggested that he purchase a home, which he did, and that Magness advertised the connection in a large number of trade publications, stating that appellee was interested in, and would manage, the mill. Appellee was unable to relocate and obtain employment for approximately twelve months after his discharge and spent approximately $700 looking for employment and was otherwise damaged.

We think it unnecessary to detail all the testimony. Appellee's general fitness for the position of manager of appellant's companies at Earle was undisputed and when all the evidence is considered, we are unable to say that there was no substantial evidence to support the jury's finding, in the circumstances here, that it was the intention of the parties, under the terms of the contract, that appellee's tenure of employment was for a term of five years.

While appellant argues that the following clause in the contract: "You are also given an option to buy 1/3 of the business on or before five years at the original cost plus improvements less normal depreciation," was only an option to appellee to purchase at any time within the five-year period, we think that the jury might have found, as they evidently did, that this clause furnished a clue to the real intention of the parties which was that the contract should continue for a five-year term.

In the case of *Norton* v. *Cowell*, 65 Md. 359, 4 Atl. 408, 57 Am. Rep. 331, the Court of Appeals of Maryland had for consideration an action brought to recover wages alleged to be due on a contract of hiring. The contract was in the nature of a letter, in part as follows: "Capt. John Cowell—Dear Sir: Your conduct during the last eighteen (18) months that you have been in my employ, has given me great satisfaction; and now . . . I appoint you superintendent of all my ships. . . . And your wages will be ($100) one hundred dollars per month, with all hotel and other expenses; and, if you give me satisfaction at the end of the first year, I will increase your salary accordingly." There the court said: "But stipulation for the payment of wages quarterly, monthly, or even weekly, are not inconsistent with a yearly hiring. *Fawcett* v. *Cash*, 5 Barn. & Adol. 908. For, as said by Lord Kenyon, C. J., in the case of *King* v. *Birdbrooke*, 4 Term. R. 245: 'Whether the wages were to be paid by the week or the year can make no alteration in the duration of the service, if the contract were for a year.' Here the written agreement furnishes a clue to the real intention of the parties, when it says: 'If you (the appellee) give me

satisfaction, at the end of the first year, I will increase your salary accordingly.' Why at the end of the year, rather than at any other time, if the contract was monthly, or only at will, as contended by the appellant? This passage of the letter, taken in connection with the situation of the parties, and the nature of the service to be performed, would seem to leave no room for doubt as to what was really contemplated by the contract of employment. It would not be reasonable to suppose that it was intended that the appellee should have the right to terminate the contract at will, and thus to imperil the interests of his absent principal.''

The general rule is stated in The American Law Institute, Restatement of the Law of Agency, p. 1030, § 442, in this language: ''However, the fact that payment is to be made in accordance with a time unit is evidence, in connection with other relevant facts, indicating that the agreement is for such unit. Thus, an agreement for the period of time mentioned as that for payment, or as the basis for payment, is indicated if one party pays consideration aside from his promise to employ or to serve; or if the agency is an important one and of a kind such that a temporary appointment would not be likely to be made; or if, as the principal has notice, the employee has made an important change in his general relations in order to accept the position, such as the removal of himself and his things to a new place; or if he has given up a position of some value in order to enter the employment.'' (161 A. L. R. 713.)

In the case of *Bennett Lumber Company* v. *Walnut Lake Cypress Company,* 105 Ark. 421, 151 S. W. 275, this court said: ''The purpose of all interpretations is to ascertain and give effect to the intention of the parties to the contract as expressed by their writing, and in doing this it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties and the sense in which, taking these things into consideration, the words used would be commonly understood; for it fairly may be assumed that the parties used and understood them in that sense,'' and in *Wood* v. *Kelsey,* 90 Ark. 272, 119 S.

W. 258, it was said: "Courts may acquaint themselves with the persons and circumstances that are the subject of the statements in the written agreement, and are entitled to place themselves in the same situation as the parties who made the contract so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described."

So here, appellee's general fitness, the importance of the position, the likelihood that a short term of employment was not contemplated, the fact that appellee had established his home in Earle with the thought of permanency, and that it was unlikely that appellee would care to buy a one-third interest during the five year period unless he were the manager during that time, all could properly be considered in determining tenure of employment intended by the parties under the wording of the contract.

The question of appellant's intoxication at the time of the execution of the contract was submitted to the jury under instructions about which there is no complaint.

Finding no error, the judgment is affirmed.