POLLOCK *v.* McALESTER FUEL COMPANY.

4-8946                                                    223 S. W. 2d 813

Opinion delivered October 24, 1949.

*Armistead, Rector & Armistead,* for appellant.

*Keith & Clegg,* for appellee.

LEFLAR, J.   Appellant William M. Pollock, Jr., owned an undivided one-half interest in the oil, gas and other minerals on a certain 20-acre tract in Ouachita County, Arkansas.  The owner of the other un-

divided one-half interest had leased it to appellee Mc-Alester Fuel Company, and the Company was desirous of leasing Pollock's half also, so that it could drill on the whole tract as a unit. After considerable negotiations between the parties and their representatives, an instrument called an "Oil and Gas Lease" was executed by them under date of July 21, 1947, covering "an undivided one-half (½) interest in and to [lands described] containing 20 acres, more or less, and 10 acres if divided." Actually this instrument was not executed until about November 1, 1947, though the earlier date was used because the parties had reached their agreement some months earlier and the final lease as executed was a replacement for others which had previously been executed with inaccurate language. In fact, a well had already been drilled and oil discovered on the land before the final execution of the lease.

A single paragraph in the lease gives rise to the present controversy. That paragraph is typewritten near the end of the printed form, and reads as follows:·

"The lessors herein expressly reserve unto themselves, their heirs or assigns, an undivided 1/16 of 7/8 of the total oil and gas and other minerals produced, saved and marketed under the terms of this lease, to be delivered to the lessors free of cost in tanks or pipelines to which lessee, their heirs, successors, or assigns, may connect wells, said interest being what is commonly known as 'over-riding royalty interest.'"

The lessor Pollock claimed that he was entitled under this paragraph to 1/16 of 7/8 of all the oil produced from the entire 20 acres, whereas the Company claimed that he was entitled only to 1/16 of 7/8 of the oil produced from the undivided one-half thereof conveyed by his lease. The present bill in equity was brought by the Company and certain others identified in interest with it against Pollock and his wife for the purpose of quieting in the plaintiff lessee the interests in the oil claimed by the lessee. The Pollocks answered and cross-complained, asking for comparable relief. After hearing evidence as to what the parties did and

said and wrote to each other prior to execution of the final lease, and as to the oil field meaning of the terms contained in the lease itself, the Chancellor found in accordance with plaintiff lessee's contentions, holding that the lessor Pollock was entitled to receive under the "over-riding royalty" clause only 1/16 of 7/8 of the oil produced from his half interest in the land, and quieting the lessee Company's title to the balance of the oil accordingly. From this decree the Pollocks appeal.

The best guide to interpretation of terms used in any instrument is the ordinary meaning of the words themselves, in their own context. Sometimes there is no standard meaning, and sometimes special usages may be shown to prove that the terms are not used in the usual sense in which they are ordinarily employed in the English language as locally spoken and written. But it is useful in any event to ascertain the ordinary meaning of the words themselves, in the proper context of the whole instrument of which they are a part.

Here, the lease by its express terms conveyed "an undivided one-half (½) interest in and to" the oil on a described piece of land "containing 20 acres more or less, and 10 acres if divided." Then the clause in question reserved to the lessors 1/16 of 7/8 of the oil produced "under the terms of this lease." It did not reserve that fraction of all the oil produced "on the land to which this lease relates" or "on the premises described by this lease," but only "under the terms of this lease." And "this lease" by its express terms was a lease of a half interest in the 20 acres, not a lease of the whole of the 20 acres. It could not have been a lease on the whole 20 acres, because the lessor owned and made it clear that he owned only a half interest. It did not purport to be a lease of anything except the lessor's half interest.

Another paragraph in the same lease, as far as its wording is concerned, might equally support the lessor's contention. This is the regular royalty clause, which reads:

"FIRST: To deliver to the credit of lessor, free of cost in tanks or pipe line to which lessee may connect his wells, the equal one-eighth (1/8) part of all oil produced and saved from the leased premises."

This clause must be read in the light of and along with another clause which appears in the same lease. This is the so-called "reduction clause":

"If said lessor owns a less interest in the above described land than the entire and undivided fee simple mineral estate therein, then the royalties and rentals herein provided shall be paid the lessor only in proportion which lessor's fee simple mineral interests therein bears to the whole and undivided fee simple mineral estate in the lands."

When these two clauses appear together in a lease, no one would contend that the regular royalty clause gives the lessor more than 1/8 of the oil produced from the half interest which he leased to the Company. This is standard language regularly used in oil leases to give the lessor a 1/8 interest in the oil produced under the interest conveyed by his lease, and it is so understood in the industry and by the courts. See Summers, The Law of Oil and Gas (1938) § 590; Thornton, The Law of Oil and Gas (Willis Ed., 1932) § 366. Yet if the reasoning employed by the lessor in this case were applied to the standard royalty clause it would give the lessor a regular royalty of 1/8 of all the oil produced on the whole 20 acres. He does not claim this, as of course he could not.

If it were necessary here to go beyond the plain meaning of the terms used in the "over-riding royalty" clause itself, this "reduction clause" would afford an indication of the sense in which the terms were used. It is enough to say now, without determining how far it might or might not be controlling, that as a key to interpretation it leads to the same conclusion that we reach from reading the words themselves.

No Arkansas case has ever passed on the question of interpretation raised by the present case. The lessor

relies principally upon Texas decisions to sustain his position. The oldest and best known of the Texas cases, among those dealing with problems substantially comparable, is *Hooks* v. *Neill,* 21 S.W. 2d 532 (Tex. Civ. App.), which involved a conveyance of a half interest in certain land, with reservation to the grantors of "a one thirty-second part of all oil on and under the said land and premises herein described and conveyed." The holding was that this reserved to the grantor only 1/32 of the oil produced from his half interest, since the half interest constituted the "premises herein described *and conveyed*" by the deed. The lessor in his argument denies that *Hooks* v. *Neill* is similar to the present case, and points out that it has been distinguished in later Texas cases. The first of these later cases is *King* v. *First National Bank,* 144 Tex. 583, 192 S.W. 2d 260, 163 A.L.R. 1128. In this case Duncan and King were the joint owners in fee simple of certain land. Duncan conveyed his half interest therein to King, reserving however a certain fraction of the royalty interest in oil and gas that should be produced "from the hereinabove described land." The Texas court held that King's reservation was of the designated fraction of the oil produced "from the described land," and not just from the half interest conveyed by King. That was what the deed said in so many words, and the court pointed out that there was no conflict between the two cases. In each case the reservation clause in the deed was given effect according to its terms. The terms were different. The most recent Texas case is *R. Lacy, Inc.,* v. *Jarrett,* 214 S.W. 2d 692 (Tex. Civ. App.), in which *Hooks* v. *Neill* was again distinguished, but not overruled. In this latest case the reservation, by a grantor owning only a part interest in the land, was of a certain fraction of the oil "produced *from the land* described in this lease," and the court held that the reservation entitled him to the designated fraction of the oil produced from all the land which the lease described, and not just from his part interest in it. Here again the court did no more than discover and apply the plain meaning of the words used in the lease.

We feel that the Texas decisions are in accord with the interpretation which the Chancellor gave to the Pollock lease. Reservations, if made, may be worded as the parties please. If they provide that the grantor shall have a named fraction of the oil produced on all of the described land, that is one thing; if they provide that he shall have a fraction of what is produced from the interest conveyed by the particular lease, it is another thing. The courts will enforce either agreement as made. For other cases which have dealt with similar problems of interpretation in a similar manner, see Mitchell v. Brown, 43 Calif. App. 2d 217, 110 Pac. 2d 456; Reynaud v. Bullock, 195 La. 86, 196 So. 29.

Apart from the language of the lease itself, appellant bases his interpretation of the "over-riding royalty" clause upon parol evidence which was admitted by the Chancellor in the trial below. This evidence consisted of a series of letters and conversations which preceded the execution of the lease in its final form. In part it explained the preparation and rejection of earlier drafts of the lease. Appellant contends that this evidence tends to show an understanding by the parties, or at least by the appellant Pollock, that the clause was to be so written as to give him 1/16 of 7/8 of the oil produced on all the land, and not just 1/16 of 7/8 of that produced under his lease of a half interest.

The basic principles applicable to the relevancy and use of such extrinsic evidence are well established. Williston, speaking of evidence as to previous negotiations between the parties; says: "Such negotiations, however, may be logically relevant for two purposes, the second of which is legally permissible, though the first is not: (1) to prove an actual intent of the parties at variance with the words of the writing when those words are given their appropriate local meaning; and, (2) to prove the meaning of the written words not by showing that the parties intended them to mean something different from what other persons at the same time and place and dealing with the same subject matter would attach to them, but to prove that the parties were dealing in regard to a matter or to secure an ob-

ject, or under circumstances where local usage would give a particular meaning to the language; or in case the local meaning is ambiguous, to show that the parties attached one appropriate meaning to their words, rather than another equally appropriate meaning." 3 Williston on Contracts (1936) § 630. And in *Magness* v. *Madden*, 212 Ark. 646, 207 S.W. 2d 714, this Court, quoting from the early case of *Haney* v. *Caldwell*, 35 Ark. 156, said: "As a general rule, oral evidence is not admissible to contradict or vary the terms of a valid written contract. . . . But if a contract is not certainly intelligible by itself, extrinsic testimony is admissible to show the intention of the parties, . . . In all such cases the extrinsic testimony is not admitted to prove what the parties to the instrument may have secretly intended; or to add to, take from, change, vary, contradict, or modify; but to find out what is the meaning of the written words they have used, and the true sense thereof as they used them."

We have examined all the extrinsic evidence offered, and are unable to discover wherein it sustains appellant's contention. The most revealing part of this evidence is that which came from the period when the parties were actually arriving at their agreement, as distinguished from that which described their jockeying over words to be included in the writing after they had already reached an agreement for a lease, commenced drilling and finally produced oil on the land.

Under the date of June 27, 1947, Pollock wrote the following letter to appellee's representative:

"Dear Sir:

"On April 28th and May 17th, I wrote you advising that I would not accept your offer for my undivided 20 acre interest in [land described] and advised you that if you were not interested in buying my 10 acre interest for $100 an acre and 1/16th override, I could make a deal with another firm, whereby I could get the override and the $100 an acre.

"Please let me hear from you as to whether or not your company is interested and, if not, I would like to

affect and make a partition with you, permitting and allowing you to take your choice of the 10 acre tract. . . .

"Yours very truly,

"W.M. Pollock, Jr."

Substantially the same language appeared in an earlier letter from Pollock to appellee's same representative, under date of May 17, 1947. Previously, and at about this time, appellee had been offering Pollock only $50 an acre for his 10 acres, and no overriding royalty whatever, but only the regular 1/8 royalty. The letter just quoted indicated quite clearly that Pollock wanted a 1/16 overriding royalty on "my 10 acre interest," which of course was the same for his purposes as an undivided half interest in the 20 acres. It was in the nature of an offer for a contract.

Apparently some conversation followed after this. At any rate, Pollock a few days later received a reply dated July 7, 1947, from appellee's representative. The significant portions of it are quoted:

"Dear Mr. Pollock:

"I am enclosing herewith lease with the 1/16 override and also draft in the sum of $1,000 covering lease interest owned by you . . . [this lease form did not correctly describe the land, and was apparently destroyed. It was not offered in evidence.]

"After talking with you the other day I took the matter up with Mr. Lawton and he advised me to proceed with meeting your requirements in getting the outstanding interests. . . .

"Yours very truly,

"W.A.G. Woodward."

There is ample reason to believe that the "requirements" which the Company's representative was to "proceed with meeting" were those set out in Pollock's letters of June 27 and May 17, 1947. So understood, the extrinsic evidence supports rather than negatives

the interpretation which derives from the language of the lease read by itself.

The decree of the Chancellor is affirmed.