**WESTERN AUTO SUPPLY CO.**

v.

**SULLIVAN.**

**SULLIVAN**

v.

**WESTERN AUTO SUPPLY CO.**

No. 14816, 14830.

United States Court of Appeals
Eighth Circuit.

Jan. 25, 1954.

Rehearing Denied in No. 14816,
March 5, 1954.

E. L. McHaney, Jr., Little Rock, Ark. (Grover T. Owens, John M. Lofton, Jr., James M. McHaney and Owens, Ehrman & McHaney, Little Rock, Ark., were with him on the briefs), for Western Auto Supply Co.

Gerland P. Patten, Little Rock, Ark. (Byron Bogard, Little Rock, Ark., was with him on the briefs), for James C. Sullivan.

Before JOHNSEN and COLLET, Circuit Judges, and NORDBYE, District Judge.

NORDBYE, District Judge.

This is an appeal by defendant, Western Auto Supply Company, from a judgment entered upon a verdict for plaintiff, James C. Sullivan, in an action for breach of contract. A cross appeal has been taken by plaintiff from the Court's order denying him interest from January 24, 1950, to the date of the judgment entered therein on the damage allowed by the jury. The parties will be referred to as they were noted below.

Plaintiff was doing business in 1948 and 1949 as the Nu-Way Products Company at North Little Rock, Arkansas. His company was engaged in the business of manufacturing bleaches and anti-freeze. The defendant is a merchandiser of auto supplies and other products, operating over a large area of the United States. Plaintiff entered into a contract to supply a glycol anti-freeze to defendant for the 1948–1949 season. At about the time deliveries under this contract were completed, plaintiff solicited defendant to purchase anti-freeze for the 1949–1950 season. On January 24, 1949, a contract for the 1949–1950 season was entered into between plaintiff and defendant wherein it was agreed that plaintiff would sell and Western

Auto would buy 150,000 gallons of "Western Glycol Permanent Anti-Freeze" at $2.04 a gallon. Under the terms of the contract, defendant agreed to supply the cans in which the anti-freeze was to be packaged. The contract provided that plaintiff should "start production as soon as cans are available; complete production by last of August [1949]."

Defendant supplied cans for 100,000 gallons of anti-freeze, and by June 15, 1949, all of these cans had been filled and stored in a bonded warehouse, and were later delivered to defendant pursuant to the contract. In March of 1949, however, the glycol market broke so that competitors of plaintiff could, and did, offer defendant substantially the same type of anti-freeze at $1.58 a gallon. Defendant refused to supply plaintiff with any more cans to be filled with anti-freeze although plaintiff requested such delivery. As a result of receiving no more cans, no further deliveries were made by plaintiff to defendant under the contract. Plaintiff thereafter, and on May 4, 1951, brought this action alleging that defendant had breached the contract by refusing to accept more than 100,000 gallons of the anti-freeze, although plaintiff was able and willing to furnish, and had requested that the defendant accept, the remaining 50,000 gallons. Defendant's defense was that the contract had been amended by mutual agreement so that defendant agreed to purchase, and plaintiff agreed to sell, only 100,000 gallons of the anti-freeze. Later, the answer was amended to supply the additional defense that defendant was excused from accepting the remaining 50,000 gallons of anti-freeze because some of the anti-freeze which had been delivered failed to meet the specifications of the contract. These defenses raise the principal questions presented on this appeal.

■■■ The circumstances out of which the alleged mutual amendment of the contract arises are these: The anti-freeze which plaintiff had agreed to manufacture for defendant was to be composed principally of glycols. After the contract had been entered into in January of 1949, plaintiff, anticipating future advances in the cost of glycols, made extensive commitments for the purchase of this ingredient to be used in the manufacture of the anti-freeze for defendant. On January 31, 1949, plaintiff informed defendant of these commitments in a letter of that date. When the glycol market broke in March of 1949, defendant then attempted to make some adjustment in its contract with plaintiff. Defendant relies upon certain telephone conversations and communications occurring between the parties at this time to support its claim that the undisputed evidence establishes that the contract was amended. Its principal claim with regard to the alleged amendment seems to be contained in a letter from one L. A. Hunting, a buyer employed by defendant, which was written to Sullivan and dated April 1, 1949, and which allegedly confirmed a telephone conversation between them:

"It is also my understanding that for the present we will let the blanket order stand at 150,000 gallons but, realizing the situation that we are faced with, with a quantity of 50,000 gallons available at a considerable lower price, you are agreeable to some alteration in the quantity if it seems necessary."

Plaintiff did not reply to this letter, and denies that he made any agreement such as defendant seeks to infer from this letter. Admittedly, the letter is indefinite as to the extent of the alterations in the quantity of the anti-freeze. Moreover, in light of all the testimony, it seems clear that the jury could reasonably find that plaintiff had not agreed to modify the quantity of anti-freeze covered by the contract, but rather that he had agreed to pass along to defendant any price reduction which he might be able to obtain from the supplier from whom he had purchased the glycols that were to be used in the manufacture of the anti-freeze for defendant. The evidence indicates that plaintiff was not able

to obtain a price reduction from his supplier, although there is testimony that plaintiff had offered at a later date to take $1.75 per gallon for the last 50,000 gallons, but apparently defendant had not accepted such offer. The record, however, fully justified a finding that Sullivan did not agree to an amendment of his contract with the defendant as defendant urges.

■ Defendant further urges, however, that "even if Sullivan never actually consented to a reduction in quantity, he, nevertheless, was estopped to deny that he had consented thereto" on the theory that plaintiff knew that defendant regarded their contract as being reduced in quantity to 100,000 gallons and yet remained silent, and relying upon this silence, defendant actually did purchase 50,000 gallons from a supplier other than plaintiff. Defendant cites in support of this proposition Peoples National Bank v. Linebarger Construction Co., 1951, 219 Ark. 11, 240 S.W.2d 12, and Mergenthaler Linotype Co. v. College of the Ozarks, 1939, 198 Ark. 904, 132 S.W.2d 8. However, since the correspondence which, according to defendant, imposed the duty upon plaintiff to speak was sent to plaintiff some 37 days after defendant had purchased the 50,-000 gallons of anti-freeze from another supplier, it seems obvious that defendant did not rely upon plaintiff's silence when it purchased the 50,000 gallons, and absent the essential element of reliance, defendant cannot urge that Sullivan is estopped from asserting that the contract was not amended. Union Indemnity Co. v. Benton County Lumber Co., 1929, 179 Ark. 752, 761, 18 S.W.2d 327, 330; Berg v. Owens, 1927, 175 Ark. 1169, 300 S.W. 417, 418.

■ Defendant also complains that the trial court erred in refusing to give its requested instruction that "a rescission may be implied where the agreement has never been followed or acted upon for a length of time." Defendant excepted to the court's refusal to give this instruction on the ground that, inasmuch as plaintiff had made no written demand for additional cans and had not commenced this action until more than two years had elapsed since the alleged breach, the jury properly could consider such circumstances in passing upon the question whether plaintiff had agreed to reduce the quantity of anti-freeze covered by the contract from 150,000 gallons to 100,000 gallons. The requested instruction may be in summary a correct statement of the law, and substantially follows the language of the Arkansas Supreme Court in Dewey Portland Cement Co. v. Benton County Lumber Co., 1933, 187 Ark. 917, 924, 63 S.W.2d 649, 651. However, the trial court's instruction on the law relative to this phase of the case seems complete and entirely adequate to present such circumstances to the jury for its consideration, wherein the court stated,

> "It is for you to determine whether or not there was a rescission or abandonment or modification of the original written contract. In determining this question, you may take into consideration not only all the testimony of the witnesses regarding the understanding arrived at in conversations, but also the conduct of the parties in the light of the surrounding circumstances, and the inference may be drawn from such conduct and circumstances that a rescission, cancellation, or modification had been agreed upon between the parties."

Having made an accurate and correct charge, the extent of its amplification as suggested by the request to charge rested in the trial court's discretion. United States v. Bayer, 1947, 331 U.S. 532, 536, 67 S.Ct. 1394, 1396, 91 L.Ed. 1654; Southern Pacific Co. v. Souza, 9 Cir., 1950, 179 F.2d 691, 695.

■ Although the alleged failure of the anti-freeze to meet the contractual specification admittedly was not the reason defendant refused to accept the remaining 50,000 gallons of anti-freeze, it seems to be generally accepted by well-

considered decisions that a party to a contract may defend on the ground that there existed at the time a legal excuse for non-performance by him although he was ignorant of that fact at the time of the breach. College Point Boat Corp. v. United States, 1925, 267 U.S. 12, 15, 45 S.Ct. 199, 69 L.Ed. 490; H. D. Williams Cooperage Co. v. Scofield, 8 Cir., 1902, 115 F. 119, 121; Restatement, Contracts, § 278. Under the instructions given to the jury to which defendant did not except, they were informed that defendant was relieved of any obligation to accept further deliveries if the anti-freeze that plaintiff had delivered did not substantially comply with the terms of the contract; and that such a fact would be a complete defense to the action regardless when the defect was discovered.

■ Defendant urges that the jury's finding that the anti-freeze was not defective is not supported by the evidence. The contract of January, 1949, between plaintiff and defendant provided the following with regard to specifications:

"* * * Blended to give specific gravity and weight the same as propylene glycol but to have increased protection through the addition of ethylene glycol and guaranteed to have a solid freeze point of below –30 degrees on a 50–50 mixture."

Plaintiff's position is that this phrase conclusively and unequivocally establishes that any mixture of glycols could be used in manufacturing the anti-freeze for defendant and that parol evidence cannot be introduced to vary the terms of the contract. On the other hand, defendant maintains that the contract calls for a blend of only propylene and ethylene glycols. In support of this view, defendant refers to that part of the specification which calls for a blend of anti-freeze having the same specific gravity and weight as propylene glycol, but having increased protection through the addition of ethylene glycol. Defendant contends that the enumeration of the two glycols in the specifications section of the contract at least raises an ambiguity

allowing the introduction of certain proffered parol testimony to explain the meaning of the written words. The trial court excluded the offer of testimony relative to the kind of glycols which in the contemplation of the parties would be blended in the manufacture of the anti-freeze. The Arkansas rule on the admissibility of parol evidence under these circumstances is expressed in Magness v. Madden, 1948, 212 Ark. 646, 648–649, 207 S.W.2d 714, 716:

"In the early case of Haney v. Caldwell, 35 Ark. 156, Mr. Justice Battle, speaking for the court, said: 'As a general rule, oral evidence is not admissible to contradict or vary the terms of a valid written contract. * * * But if a contract is not certainly intelligible by itself, extrinsic testimony is admissible to show the intention of the parties, * * *. In all such cases the extrinsic testimony is not admitted to prove what the parties to the instrument may have secretly intended; or to add to, take from, change, vary, contradict, or modify; but to find out what is the meaning of the written words they have used, and the true sense thereof as they used them.' "

The question thus presented is whether the contract is "certainly intelligible by itself". The trial court submitted to the jury the question of what kind of glycols the contract called for without the aid of the proffered oral testimony as to what was contemplated by the parties. Defendant's contention that the specification section introduced doubt into the meaning of the phrase "a glycol permanent anti-freeze" is not persuasive. Although the specification section makes it clear that the ethylene glycol was to be blended in, the mention of propylene glycol does not connote that the blend must contain propylene glycol, much less that it must contain only propylene glycol. It seems clear that the parties understood that a glycol permanent anti-freeze was an anti-freeze that contained glycols. But plaintiff was

obligated to manufacture a blend of glycols which would have the same specific gravity and weight as propylene glycol, and then to afford additional or added protection by the addition of ethylene glycol. It appears that it was important that the anti-freeze should be of the same weight and specific gravity as propylene glycol so that a propylene hydrometer could be used to test accurately the strength of the anti-freeze mixture in automobile radiators. The jury found under the instructions of the court that the mixture did have the same specific gravity and weight as propylene glycol and that there was added to the mixture ethylene glycols. In view of the jury's finding in that regard, defendant's contention that the anti-freeze was composed of an improper mixture of glycols cannot be sustained.

■ Defendant urges, however, that even though the anti-freeze complied with the specifications as to the types of glycols in the mixture, the evidence establishes that the anti-freeze did not have the same weight and specific gravity as propylene glycol. It is undisputed that the specific gravity of propylene glycol is 1.0381 at 20 degrees Centigrade and that the anti-freeze produced by plaintiff, as tested by Dr. Vaughn, defendant's expert, indicated a specific gravity of 1.0455, and as tested by one Van Trump, plaintiff's witness, specific gravity was 1.048 and 1.046; that is, Vaughn's test of plaintiff's anti-freeze showed a difference of .0074 and Van Trump's test .0079 and .0099 of 1 degree from the specific gravity of propylene glycol. These tests were made some 3 years after the anti-freeze had been canned. Whether the age of the mixture in any way affects the specific gravity does not appear in the evidence. Plaintiff testified that when the anti-freeze was canned, every batch was tested and it was found to conform to the specifications. But if the variances in the tests require a finding that the anti-freeze did not conform to the gravity specifications at the time the breach occurred, there is no evidence in the record bearing upon whether this variance in specific gravity constituted a substantial or inconsequential breach. In view, therefore, of the absence of a satisfactory showing as to the significance of the variance in the tests made and the specific gravity called for by the specifications, we conclude that it was for the jury to determine whether the specific gravity of the anti-freeze manufactured by plaintiff was substantially the same as propylene glycol. The jury so found and there was sufficient evidence to sustain that finding.

■ The contractual specifications provided that the anti-freeze "have a solid freeze point of below −30 degrees on a 50–50 mixture [of water and anti-freeze]." The dispute here centers around the meaning of the expression "solid freeze point", a phrase apparently having no customary meaning in the anti-freeze industry. A witness for the defense stated that there is no such thing as a solid freeze point and that the phrase in question merely connoted the temperature at which the solution lost its quality as an anti-freeze, i. e., that temperature at which crystals of ice first appeared in the solution, and his testimony was that this occurred at −18 degrees Fahrenheit. A witness for plaintiff testified, however, that the solid freeze point was synonymous with the "pour point"; another witness for plaintiff testified that the solid freeze point was five degrees colder than the pour point. The pour point test is customarily used in the testing of lubricating oils. And it appears from the testimony that the pour point is the temperature at which a solution in a test tube which has been submerged in a freezing compound will not move if held in a horizontal position for five seconds. However, there is a permissible variation of five degrees within the same laboratory on a pour point test. Giving each pour point test that was made of the anti-freeze the benefit of the five degree variation, the evidence indicates that the tests reflected the following temperatures for the pour point: −35 degrees,

—32 degrees, —35 degrees, —40 degrees, and —35 degrees. Apparently the jury accepted the definition of solid freeze point as testified to by plaintiff's witnesses, and we conclude that, in view of the circumstances herein, the meaning of "solid freeze point" was a question for the jury's determination; at least, the jury could reasonably find that "solid freeze point" was either the pour point or five degrees colder than the pour point, and accepting that interpretation of the specifications, the evidence amply sustains a finding that the solid freeze point was at least —30 degrees Fahrenheit.

■ Defendant's final argument for reversal is that the evidence relative to proof of damages is insufficient to support the verdict. It is recognized by both parties that the measure of damages is the difference between the market price at the time of the breach, and the contract price. The contract price was $2.04 a gallon. There was testimony that the market price was between $1.50 and $1.60 a gallon whether the breach took place in April or May when the defendant was required to deliver the cans for the packing of the anti-freeze or whether the breach took place in August when the payment was due. Moreover, defendant offered evidence that it was able to purchase similar anti-freeze from another supplier in April of 1949 at $1.58 a gallon. Under these circumstances, we conclude that there was sufficient evidence as to market price at the time of the breach to sustain the jury's assessment of damages. It follows, therefore, that on defendant's appeal the judgment will be affirmed.

### Sullivan's Appeal.

Plaintiff appeals from that part of the judgment denying his motion to assess interest at six per cent on the damages accorded by the jury from January 24, 1950, to the date of the entry of the judgment on April 24, 1952. Although plaintiff alleged the breach of contract to have taken place not later than August, 1949, interest was requested from January 24, 1950. No request was made by plaintiff that the jury should assess interest on the damages returned and no such instruction was given to the jury by the court. However, after the jury's verdict was returned, plaintiff made a motion for the allowance of interest on the verdict as requested in his complaint. This request the court denied. The question presented, therefore, is whether plaintiff was entitled to interest as requested in his motion as a matter of right. Although the trial court merely entered an order denying the motion for interest without any comment, we assume it concluded that, in view of the particular facts in this case, the Arkansas decisions did not indicate that an allowance of interest was mandatory. Obviously, there are several factors of uncertainty as to the time of performance of the contract, and also as to the standard by which the market price of the anti-freeze could be established. The agreement provided that payments should be made by defendant upon receipt of warehouse receipts from the bonded warehouse noting the delivery of any quantity of anti-freeze, and according to the contract, if it had been completed, the delivery would have taken place during the summer of 1949 and up to the latter part of August, 1949. When it appeared that the glycol market had broken and that defendant was able to procure comparable anti-freeze from other sources at a price much lower than the contract price, the parties had rather extended negotiations as to some solution of their problem. Plaintiff endeavored to obtain some concessions from his supplier so as to relieve the defendant of the obligation to pay the full contract price. And there is testimony in the record that, during negotiations, plaintiff agreed to modify the contract price from $2.04 a gallon to $1.75 a gallon. The latter figure of $1.75 a gallon is the market value of the anti-freeze which the jury apparently determined in assessing plaintiff's damages. 50,000 gal-

lons multiplied by the difference between $2.04 and $1.75 produces $14,500, which is the exact amount of the verdict the jury returned in favor of plaintiff. Concededly, in light of the evidence, there was no precise or definite market price for the particular blend of anti-freeze called for by the specifications in the contract and which could be utilized by defendant in computing with any exactness the damages inuring to the plaintiff as the result of the breach. No formal demand for any amount of damages was made by plaintiff until he instituted this suit in May, 1951. A consideration of the pertinent Arkansas decisions does not indicate that the Arkansas Supreme Court had unequivocally laid down the rule that in all cases interest must be allowed on a defendant's liability for breach of contract, and we have not been referred to any Arkansas decision in a breach of contract suit where the allowance of interest from the date of the verdict was mandatory in a factual situation comparable to the one herein. There is a statement in Loomis v. Loomis, 255 S.W.2d 671, a case involving the question of interest on delinquent payments for child support, decided by the Supreme Court of Arkansas on March 9, 1953, that in spite of certain uncertainties, interest may be recoverable under certain circumstances from the date of the breach of a contract. The court in that decision referred to Section 337 (a), Restatement of Contracts, wherein the following appears:

"Where the defendant commits a breach of contract to \* \* \* render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculations from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, \* \* \*."

But here there was no established market price for plaintiff's anti-freeze when the glycol market broke and when the breach occurred. The quoted portion from Restatement of Contracts makes it clear that damages must be ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter. The variance between the testimony as to market price herein and the amount determined by the jury as the market price is reflected in the jury's verdict and emphasizes the uncertainties in this regard. The jury must have determined that plaintiff's offer of $1.75 a gallon for the remaining 50,000 gallons of anti-freeze fairly reflected the reasonable market price. All of these facts, therefore, may well have motivated the trial court in determining that the damages were essentially unliquidated and that in his discretion under a reasonable construction of the Arkansas decisions, interest was not mandatory. Rogers v. Yarnell, 51 Ark. 198, 10 S.W. 622; Southern Surety Co. v. Barham, 133 Ark. 220, 202 S.W. 231; White & Black Rivers Bridge Co. v. Vaughan, 183 Ark. 450, 36 S.W.2d 672; Norton v. Hickingbottom, 212 Ark. 581, 206 S.W.2d 777; Kennedy v. Clayton, 216 Ark. 851, 227 S.W.2d 934; Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265, which was cited in White & Black Rivers Bridge Co. v. Vaughan, supra.

And in that this case is controlled by local law, we do not feel justified in adopting views which are contrary to that of the trial judge in absence of a showing that the trial court's conclusion as to interest was induced "by a clear misconception or misapplication of the local law," Western Casualty & Surety Co. v. Coleman, 8 Cir., 186 F.2d 40, 43. As the court further stated in that case, "If a federal district judge has reached a permissible conclusion upon a question of local law, we will not reverse, even though we may think the law should be otherwise." See also, Kimble v. Willey, 8 Cir., 204 F.2d 238.

We conclude, therefore, that the trial court's conclusion as to interest was permissible in his discretion under the Arkansas decisions in view of the

particular facts herein and that the court did not err in denying interest on the amount of the verdict from the date of the breach. The decision of the trial court on this appeal is therefore affirmed.