**LEBCO, INC., et al., Appellants,**

v.

**MacGREGOR PARK NATIONAL BANK OF HOUSTON, Appellee.**

No. 810.

Court of Civil Appeals of Texas, Houston (14th Dist.).

Sept. 19, 1973.

Rehearing Denied Oct. 17, 1973.

Ralph S. Carrigan, Baker & Botts, Houston, for appellants.

W. Robert Brown, Christopher B. Allen, Liddell, Sapp, Zivley & Brown, Houston, for appellee.

CURTISS BROWN, Justice.

This case involves an action and a cross-action on a construction contract.

Lebco, Inc. (Lebco) brought suit on a contract for the construction of a bank building and parking lot against Mac-Gregor Park National Bank of Houston (the Bank). The Bank brought a cross-action on the contract warranties for the costs of replacing the entire parking lot

(less expenses for the addition of lime which was not called for in the original specifications), the attendant expense of hiring traffic officers, and interest on such sums. Transamerica Insurance Company (Transamerica), surety for Lebco on its construction bond, was joined as a third party defendant.

The case was tried to the court. It entered a judgment in favor of Lebco for the $12,923.73 with interest (being funds retained by the Bank to protect it against certain possible lien claims) and judgment in favor of the Bank against Lebco and Transamerica for $29,153.50 (which represents repairs of $33,311 less $6,500 for lime work plus $2,342.50 for the traffic control officers) with interest. Appropriate findings of fact and conclusions of law were made in support of the judgment.

Lebco and Transamerica have duly perfected this appeal.

Appellants' basic contentions are twofold. First, they contend that the trial court erred in finding and concluding that a letter agreement of September 16, 1969, did not amend the contract so as to modify the scope of the guarantee relative to the parking lot. Second, they contend that the Bank failed to establish liability on its cross-action because the approval of the Bank's architect to the corrective work was essential to recovery, but not obtained.

The construction contract related to the Bank's new building and parking lot. The facilities were constructed by Lebco and the Bank opened for business in its new quarters on May 25, 1969. The Bank seems to have been entirely pleased with the work of the contractor with respect to the building itself. This suit originated in problems arising out of the parking lot. Shortly following the opening, difficulties began to develop in the parking area. Ruts formed in the drive-in lanes in front of the windows. After a time pavement wrinkled at the edges where cars parked on the lot. Cracks formed and water seepage of unknown origin appeared.

The Bank requested laboratory tests to determine whether the lot met the specifications of the contract. A report by Tri-Western Testing Laboratories dated May 31, 1969, showed that the parking lot failed to meet specifications in several material respects. First, the middle layer of the three layers composing the parking lot was not of sufficient thickness. In many areas there were substantial variances from the 6″ specifications. Second, the moisture content of the limestone in many areas was too high. Third, the compaction specifications for the middle layer were not satisfied in several locations on the lot. Lebco has never disputed that the lot as completed did not meet contract specifications.

The contract contains the following provision:

"4.5 WARRANTY AND GUARANTEE

4.5.1 The Contractor warrants and guarantees to the Owner and the Architect that all materials and equipment incorporated in the Project will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards may be considered defective by the Owner or the Architect. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

4.5.2 The warranties and guarantees provided in this Paragraph 4.5 and elsewhere in the Contract Documents shall be in addition to and not in limitation of any other warranty or guarantee or remedy required by law or by the Contract Documents."

In addition to the general conditions the parties entered into an additional paragraph to the contract which was typed. Most of the contract was printed.

The typewritten provision is labeled "Article 9" and reads as follows:

"ARTICLE 9

The warranties and guaranties provided in this paragraph shall be in addition to

and not in limitation of any other warranty or remedy required by law or by the contract documents.

Contractor unconditionally guarantees all labor, materials and equipment furnished and all work performed against any and all defects in workmanship and materials for a period of one year from the date of final payment; and Contractor agrees to promptly correct and replace any such defective workmanship, materials and equipment, and further agrees to pay for any injury or damage to other work resulting therefrom, if such injury or damage is discovered within the one year guaranty period. This guaranty shall not be affected by acceptance, possession or use by Owner of any work done or performed by Owner. Owner agrees to give Contractor written notice of such defect with reasonable promptness; if Contractor fails within 15 days after receipt of any such notice to begin the correction of any such specified defects, or if Contractor fails to prosecute such work with no interruption, Owner may, at Owner's option, proceed with the correction of such defects and any such injury or damage at the expense of Contractor who shall repay to Owner the reasonable cost thereof on demand. This paragraph replaces and is substituted for paragraph 13.2.2 of Article 13 of the General Condition."

Complaints of the Bank relative to the lot caused Lebco to undertake repairs on several occasions during the summer of 1969. Lebco remedied the drive-in lanes by installing cement stabilizing shell. It also installed such shell in an area where certain trash trucks operated. This latter work was apparently done at the expense of the Bank because of the unusual use of the area.

Despite these efforts satisfactory results were not obtained and in early September of 1969 representatives of the parties met on the parking lot to discuss and attempt to resolve the problems presented. As a result of that meeting the parties signed an agreement reduced to writing in a letter prepared by the Bank's attorneys and addressed to Lebco dated September 16, 1969.[1]

1.

Mr. Arthur J. LeBlanc
President
Lebco, Inc.
\* \* \*
Mr. C. A. Johnson
Architect
\* \* \*
Transamerica Insurance Company
\* \* \*

"September 16, 1969

Re: Construction of Bank
Building for MacGregor
Park National Bank of
Houston (Bank) by Lebco,
Inc. (Lebco)

Gentlemen:

This letter is to confirm the agreement reached as a result of a meeting at the Bank on Wednesday, September 3, 1969. At that time it was established that the specifications regarding paving had not been met as provided in the Construction Contract (Contract) between Bank and Lebco.

In order to remedy the defects in the paving, you agreed on behalf of Lebco to cover the entire parking lot with a coating of jennite seal coat installed according to manufacturer's specifications and to do the other work required by Mr. C. A. Johnson, the project Architect (Architect) in order that he may certify the paving as being satisfactory (Paving Work), all as set forth in a drawing and agreement signed on behalf of Lebco and by Architect and dated September 9, 1969 (Specifications). The Paving Work is to be completed on or before October 15, 1969 (Completion Date).

Pending completion of the Paving Work (as provided in the Specifications), it is our agreement that the Bank will retain the sum of $10,000.00 (Paving Fund) solely as security. for the performance of the Paving Work. Upon completion of the Paving Work on or before the Completion Date, and upon certification by the Architect that the Paving Work has been performed in accordance with the Specifications, the Paving Fund will promptly be paid to Lebco by the Bank. In the event the Paving Work is not performed in accordance with the Specifications by the Completion Date and such certificate so issued by. the Architect, then the Bank may apply such sum toward such completion of the Paving Work. The Paving Fund is to be held, without interest, by the Bank solely to secure performance of the Paving Work as provided in the Specifications and for no other purpose.

Also at such meeting certain calking work (Calking) was deemed inadequate by the Architect and the Bank is to retain $500.00 (which is deemed adequate by the Architect), without interest, (Calking Fund) solely to secure the performance of the Calking by Lebco by September 30, 1969. The Calking Fund is to be promptly paid to Lebco upon the Architect's certification that the Calking is satisfactory. In the event the Calking is not so performed by Lebco, then the Bank may apply the Calking Fund toward completion of the Calking.

Further discussed at the meeting were three (3) outstanding liens which were filed against the Bank's land and building as a result of the subject construction. These liens were filed by George Air-Conditioning Distributing Company, Inc. ($5,113.95), Building Specialties, Inc. ($700.00) and W. L. Lashley & Associates, Inc. ($2,801.87). So long as a lien is (i) unreleased, (ii) not properly bonded, or (iii) not removed by final judicial judgment (items (i), (ii), and (iii) being collectively referred to as "satisfy", "satisfied" or "satisfaction"), the Bank will retain the sum of one and one-half (1½) times the total amount of each lien involved (Lien Fund, being $12,923.73) solely to secure satisfaction of such liens. Whenever a lien is satisfied by. Lebco's efforts, the Bank will promptly pay Lebco the portion of the Lien Fund held by the Bank to secure the satisfaction thereof, together with interest in the amount of four per cent (4%) per annum from the date hereof on any. amount so paid to Lebco (provided that no portion of the Lien Fund will earn interest after the expiration of one (1) year from the date hereof). After the expiration of one (1) year from the date hereof, the Bank may satisfy any or all of such liens out of the Lien Fund (including all costs, expenses and fees incurred by the Bank in obtaining such satisfaction).

It is understood that Lebco, upon its approval hereof, will furnish the Bank with a full and complete release of all of Lebco's rights under the Contract (as well as any certificate or other matters required by the American Title Company. to issue an Owner's Title Insurance Policy showing no exceptions with respect to the Contract) covering the subject improvements, even though the aforesaid sums are being withheld by the Bank from the final payment to Lebco under the Contract.

By this Agreement the Bank does not waive any. of its rights under the Contract or the Performance and Payment Bonds issued by Transamerica Insurance Company with respect to the Contract.

If the foregoing properly sets forth the matters to which it relates, please so signify by signing at the place provided below and return a copy to us.

Very truly yours,
MacGREGOR PARK NATIONAL BANK
OF HOUSTON
BY: /s/ C. B. Carter, Jr.
C. B. Carter, Jr.
Vice Chairman of the Board

Approved and Agreed to this 18th day of September, 1969:
LEBCO, INC.
BY /s/ Arthur J. LeBlanc
Arthur J. LeBlanc
President
/s/ C. A. Johnson
C. A. Johnson
Architect
TRANSAMERICA INSURANCE COMPANY
BY /s/ M. D. Plagins"

The September 9, 1969, agreement, which is referred to in the letter of September 16, 1969, recites:

"The contractor shall make the repairs to the paving as shown on this sheet. When these repairs meet the approval of the architect the contractor shall give the entire flexible base topping one coat of "jennite" seal coat according to the manufacturer's specifications. When the "jennite" seal coat meets the approval of the architect the paving shall be re-stripped as it was when the bank opened. When the above conditions have been met the flexible base will be accepted as meeting the requirements of the plans and specifications."

The work as set out in the letter agreement was performed satisfactorily by Lebco. Upon approval by the Bank's architect $10,000 which had been retained for the parking lot was paid to Lebco on November 18, 1969, and the parking lot was accepted at such time. Although $12,923.73 was still being withheld by the Bank to secure satisfaction of certain claimed liens against its property, the parties appear to agree that November 18, 1969, was the date of final payment insofar as the parking lot was concerned. Thus the one-year "guaranty" period ran from that date.

Unfortunately the measures taken pursuant to the letter agreement did not correct the defects in the parking lot. Responding to the Bank's continued complaints Lebco performed "spot" repairs after November 18, 1969, and as late as July of 1970. On September 2, 1970, Lebco was notified by the Bank's attorney that it was to correct "extensive failures in the paving." In response to the Bank's demand Lebco failed to take any corrective action and such failure to act came within the one-year warranty period on the paving (November 18, 1969—November 18, 1970).

Without consulting its architect or Lebco the Bank caused another testing laboratory to appropriately examine the stability of the lot in question. The Bank also pro-cured the opinion of an expert paving contractor. The contractor recommended that most of the lot be completely replaced so as to meet the original contract specifications. The contractor would not agree to "guarantee" the work unless lime was added to the crushed limestone base at a cost of $6,500. This item was *not* included in Lebco's contract with the Bank. Both the laboratory results and the paving contractor's estimate were sent to Lebco through its attorney. The estimate called for an expenditure of $33,311.

It appears that water seeping into the lot contributed substantially to its deterioration. The evidence also establishes that the addition of lime to crushed limestone causes a barrier to form which is resistant to water and thus would tend to preserve the lot.

When Lebco did not respond to the letters demanding corrective action, the Bank, without the approval of its architect, employed the paving firm to redo virtually the entire lot. In this suit the Bank successfully procured judgment of the trial court reimbursing it for such expenses thus incurred (less the lime expense which was not a specification of the original contract) and the added expense of hiring traffic control officers to facilitate vehicular traffic during the construction period.

■ Appellants' first contention is that the letter agreement of September 16 modified the contract so as to expressly deal with the parking lot problem and set out the manner in which it would be handled by the parties. Lebco correctly claims that the letter agreement was supported by independent consideration in that the "jennite" seal coat was not required in the original contract nor the specifications. It is also quite clear that the defects in the parking lot with respect to the surface blemishes and with respect to sub-surface deviations from contract specifications were known to all parties at such time. Nevertheless, the letter agreement express-

ly provides the consideration running to Lebco:

> "Upon completion of the Paving Work on or before the Completion Date, and upon certification by the Architect that the Paving Work has been performed in accordance with the Specifications, the Paving Fund will promptly be paid to Lebco by the Bank."

The September 9 specification provides "when the above conditions have been met the flexible base will be accepted as meeting the requirements of the plans and specifications." The consideration running to Lebco for the additional work that it undertook to perform was the acceptance of the lot and the payment to it of the paving fund.

> The letter agreement expressly provides:

> "By this Agreement the Bank does not waive any of its rights under the Contract or the Performance and Payment Bonds issued by Transamerica Insurance Company with respect to the Contract."

In addition to this express reservation of the one-year guarantee provided by Article 9, the construction placed on the instrument by the parties themselves after September 16, 1969, supports this conclusion. RESTATEMENT OF CONTRACTS sec. 235(e) (1932). Lebco performed much work on the parking lot after November 18, 1969.

Lebco next contends that Article 7.6.1 of the contract requires that the Bank's architect must approve both the corrective action and the amount charged to the contractor for such work before the Bank may avail itself of self-help corrective action.

Article 7.6.1 of the general conditions of the contract reads as follows:

> "7.6 OWNER'S RIGHT TO CARRY OUT THE WORK
>
> 7.6.1  If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents or

fails to perform any provision of the Contract, the Owner may, after seven days' written notice to the Contractor and without prejudice to any other remedy he may have, make good such deficiencies. In such case an appropriate Change Order shall be issued deducting from the payments then or thereafter due the Contractor the cost of correcting such deficiencies, including the cost of the Architect's additional services made necessary by such default, neglect or failure. The Architect must approve both such action and the amount charged to the Contractor. If the payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall pay the difference to the Owner."

It is noted that Article 7.6.1 states "the Architect must approve both such action and the amount charged to the Contractor." The parties have the right to contractually bind themselves to be governed by an architect's determination which can be avoided only by a showing of fraud, misconduct, or such gross mistake as to imply bad faith. City of San Antonio v. McKenzie Const. Co., 136 Tex. 315, 150 S.W.2d 989, 997 (1941); Boettler v. Tendick, 73 Tex. 488, 11 S.W. 497 (1889).

Nevertheless, Article 9 (the one-year guarantee following acceptance) expressly provides that after notice to the contractor the owner may make this determination:

> "Owner agrees to give Contractor written notice of such defect with reasonable promptness; if Contractor fails within 15 days after receipt of any such notice to begin the correction of any such specified defects, or if Contractor fails to prosecute such work with no interruption, *Owner may, at Owner's option,* proceed with the correction of such defects and any such injury or damage at the expense of Contractor who shall repay to Owner the reasonable cost thereof on demand." (emphasis supplied)

This provision is not in conflict with paragraph 4.5.1 nor 7.6.1 of the General Conditions since both may be construed to apply to work before final acceptance. If there is a conflict then the typewritten Article 9 would prevail over the printed Article 7.6.-1. *See* McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 344 (1957).

We have reached our decision in this case with some difficulty. The record suggests that the problems with the parking lot may have been due to both the defects in workmanship and the failure to specify the use of lime in the subbase. Also the evidence is susceptible to the conclusion that the tearing up of virtually all of the lot and doing it over may have been somewhat drastic. Nevertheless, these matters were determined against appellants by the trial court in a judge trial on the basis of ample evidence and the case should, therefore, be affirmed.

Affirmed.

## On Motion for Rehearing

Appellants have filed a motion for rehearing complaining of our construction of the contract between Lebco and the Bank with respect to both the clause requiring approval by the project architect and the effect of the agreement of September 16, 1969, on the contract warranty.

■ On reconsidering paragraph 7.6.1 of the General Conditions, we agree with appellants' first contention that by the terms of paragraph 13.2.1, paragraph 7.6.1 should not be construed to apply only to work done before acceptance. Nevertheless, this does not change the result we have reached in this case. Appellants urge that no conflict exists between the typewritten Article 9 and the printed paragraph 7.6.1. We believe there is a clear conflict. Article 9 provides that after notice to the contractor, if the contractor fails to correct defects within fifteen days, "Owner may, *at Owner's option,* proceed with the correction of such defects . . . ." (emphasis supplied). Paragraph 7.6.1 already gave the owner the right to correct defects *with* the architect's approval. Therefore the quoted language of Article 9 can have no meaning other than that the owner *may* correct defects *without* the architect's approval. This conflict must be resolved in favor of the typewritten Article 9. *See* McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 344 (1957). Furthermore, since Article 9 gives the owner the "option," his earlier conduct in securing the architect's approval did not require that he secure approval for all repairs.

■ Appellants' further contention concerns the effect of the agreement of September 16, 1969, on the warranty contained in Article 9. Acceptance as in accordance with plans and specifications does not waive rights under a warranty for a specified period. 17A C.J.S. Contracts sec. 514(2)a (1963). Article 9 is a warranty for a specified one-year term. The agreement of September 16, 1969, expressly provides that "the Bank does not waive any of its rights under the contract . . . ." The agreement therefore had no effect on the Article 9 warranty. There was expert testimony, believed by the trial court, that the failure of the parking lot was due to defects in workmanship and materials.

Motion for rehearing overruled.